# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| | : |
| v. | : Hon. Leda Dunn Wettre |
| | : |
| YITZACHOK KURTZER, | : Mag. No. 20-13360 |
| a/k/a BARRY KURTZER, | : |
| ROBIN KURTZER, | : **CRIMINAL COMPLAINT** |
| SHANELYN KENNEDY, and | |
| AMBER HARRIS | |

I, Daniel Shim, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Daniel Shim, Special Agent
Federal Bureau of Investigation

Special Agent Shim attested to this Affidavit
by Telephone Pursuant to F.R.C.P. 4.1(b)(2)(A).

July 8, 2020, at
District of New Jersey

HONORABLE LEDA DUNN WETTRE    _____
UNITED STATES MAGISTRATE JUDGE    Signature of Judicial Officer

# ATTACHMENT A

### (Conspiracy to Violate the Federal Anti-Kickback Statute)

From in or about October 2018 to in or about June 2020, in the District of New Jersey and elsewhere, defendants

**YITZACHOK KURTZER a/k/a BARRY KURTZER,
ROBIN KURTZER,
AMBER HARRIS, and
SHANELYN KENNEDY**

did knowingly and intentionally conspire and agree with each other and others to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in exchange for the furnishing and arranging for the furnishing of items and services, namely, the referral of genetic screening tests, for which payment was made in whole or in part under a Federal health care program, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A).

In violation of Title 18, United States Code, Section 371.

# ATTACHMENT B

I, Daniel Shim, a Special Agent with the Federal Bureau of Investigation ("FBI"), having conducted an investigation and having discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all dates described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

## Relevant Individuals and Background Information

1. At various times relevant to this Complaint:

    a. Defendant DR. YITZACHOK KUTZER, a/k/a BARRY KURTZER ("BARRY KURTZER") resided in Rockland County, New York and was a physician licensed in Pennsylvania. He practiced medicine in three Pennsylvania offices (collectively the "Kurtzer Offices"), located in Scranton (the "Scranton Office"), Lake Ariel (the "Lake Ariel Office"), and Greentown (the "Greentown Office).

    b. Defendant ROBIN KURZTER ("ROBIN KURTZER"), BARRY KURTZER's wife, also resided in Rockland County, New York and helped manage the Kurtzer Offices.

    c. Defendant SHANELYN KENNEDY ("KENNEDY") resided in Pennsylvania and worked as an assistant in the Kurtzer Offices.

    d. Defendant AMBER HARRIS ("HARRIS") resided in Monroe County, Pennsylvania and worked as an assistant at the Kurtzer Offices.

    e. "Employee-1," a coconspirator not charged in this Complaint, worked as an assistant in the Kurtzer Offices.

    f. Medicare was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was a "health care program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(t). People who received benefits under Medicare were commonly referred to as "beneficiaries."

2

g. The Medicare Part B program was a federally funded supplemental insurance program that provided Medicare insurance benefits for individuals aged 65 or older, and for certain individuals who were disabled. The Medicare Part B program paid for various medical services for beneficiaries, including diagnostic genetic tests.

h. Genetic tests were laboratory tests designed to identify specific inherited mutations in a patient's genes. These genetic variations affected a patient's risk of developing certain diseases or how the patient responded to medications.

i. Pharmacogenomic genetic tests related to identifying how a patient's genes affect the patient's response to drugs were commonly referred to as "PGx" tests. Genetic tests related to a patient's hereditary predisposition for cancer were commonly referred to as "CGx" tests.

j. To conduct a genetic test, a laboratory had to obtain a DNA sample from the patient, typically from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The DNA sample was then submitted with a requisition form to the laboratory for analysis, such as PGx and CGx. The requisition form typically included information about the patient, the swab being submitted, and the referring physician. That physician or another authorized person had to confirm on the form that the genetic test was medically necessary.

k. If the patient had insurance, the laboratory typically submitted a claim for reimbursement for the test to the patient's insurance carrier. Reimbursement rates for PGx may have exceeded $1,900 per test, while reimbursement rates for CGx may have exceeded $6,000 per test.

l. "Laboratory-1," located in New Jersey, and "Laboratory-2," located in Pennsylvania, were clinical laboratories that each collected genetic tests and submitted claims for reimbursement to Medicare.

m. In most cases, Laboratory-1 and Laboratory-2 did not perform the actual genetic testing onsite. Instead, both typically outsourced the testing to "Laboratory-3," located in New Jersey.

n. "Individual-1"[1] resided in New Jersey and worked as a sales representative for Laboratory-1 and Laboratory-2. Individual-1's compensation from

---

[1] Individual-1 is a cooperating witness who, in or about the spring 2019, while cooperating with the Government on federal charges, was discovered engaging in additional

3

each laboratory was based in part on the volume of genetic tests that Individual-1 generated for Laboratory-1 or Laboratory-2 through Individual-1's physician accounts.

## The Conspiracy

2.  Before in or about the fall 2018, BARRY KURTZER had never sent any diagnostic tests to Laboratory-1, including for genetic tests. He then met Individual-1, who began servicing the Kurtzer Offices for Laboratory-1.[2] Soon after establishing this business relationship, BARRY KURTZER and ROBIN KURTZER entered into a deal with Individual-1: in exchange for BARRY KURTZER steering genetic tests for his Medicare patients to Labortory-1, Individual-1 would pay BARRY KURTZER. BARRY KURTZER and ROBIN KURTZER negotiated for Individual-1 to pay them approximately $2,000 per month, up from Individual-1's initial price of between approximately $1,000 and $1,500 per month.

3.  In the months that followed, consistent with the kickback arrangement, BARRY KURTZER and his staff performed DNA swabs for genetic tests, primarily PGx, on many of BARRY KURTZER's Medicare patients. At BARRY KURTZER's direction, his staff then sent those genetic tests to Laboratory-1 in New Jersey. As a result, from in or about December 2018 to in or about May 2019, the Kurtzer Offices, under BARRY KURTZER's name, submitted genetic tests to Laboratory-1 for approximately 106 Medicare patients, for which Medicare was billed approximately $507,950.

4.  In or about the same time period, Individual-1 paid BARRY KURTZER approximately $2,000 per month as a kickback for the genetic tests that BARRY KURTZER and his staff steered to Laboratory-1. For each payment, Individual-1 traveled from New Jersey to one of the Kurtzer Offices, where Individual-1 handed BARRY KURTZER $2,000 cash, typically in $100 denominations.

5.  From in or about June 2019 to in or about early July 2019, Individual-1 did not pay kickbacks or bribes to BARRY KURTZER. In turn, the volume of

---

criminal conduct during the term of Individual-1's cooperation. Individual-1 acknowledged that additional criminal conduct and has continued to cooperate with the Government.

[2] BARRY KURTZER met Individual-1 through an individual Dr. Lee Besen who is presently charged in two separate criminal complaints, each charging a conspiracy to violate the federal Anti-Kickback Statute, contrary to 42 U.S.C. § 1320a-7b(b)(1), in violation of 18 U.S.C. § 371. *See* Mag Nos. 20-13358 (LDW); 20-13359 (LDW). One of those complaints, *see* Mag No. 20-13358 (LDW), describes a scheme highly similar to the one charged in this case.

genetic tests that BARRY KURTZER and his staff sent to Laboratory-1 in or about July 2019 decreased.

6. On or about July 23, 2019, Employee-1 texted Individual-1, "Doc [referring to BARRY KURTZER] wants to know if our agreement is over?"[3] Individual-1 wrote back that Individual-1 planned to visit BARRY KURTZER in the coming week and that the agreement was "continuing."

7. On or about July 31, 2019, Individual-1 traveled from New Jersey to meet BARRY KURTZER at his Lake Ariel Office. During the meeting, which was recorded, BARRY KURTZER welcomed Individual-1 back and explained that the volume of genetic tests temporarily decreased because Individual-1 had "disappeared." Individual-1 acknowledged that Individual-1 "didn't work the last two month[s]" and gave BARRY KURTZER a kickback and bribe of approximately $2,000 cash saying, "so here's 2,000." BARRY KURTZER replied, "Thank you."

8. BARRY KURTZER and Individual-1 next agreed to meet at the Greentown Office on or about September 12, 2019. When Individual-1 arrived, ROBIN KURTZER was also there and participated in the meeting, which was recorded. BARRY KURTZER received from Individual-1 a kickback and bribe of approximately $2,000 cash as Individual-1 said, "here's your 2K for our agreement." BARRY KURTZER responded, "You know you still owe me, you missed a month." After Individual-1 stated that Individual-1 "wasn't really working that month," BARRY KURTZER said, "That doesn't affect me. I gave you stuff [referring to genetic tests] didn't I?" Individual-1 replied, "You're right. I'll catch you up."

9. During the same meeting, BARRY KURTZER and ROBIN KURTZER told Individual-1 that BARRY KURTZER was not being paid enough, and they renegotiated the terms of the kickback agreement from $2,000 to $3,000 a month in exchange for BARRY KURTZER agreeing to steer approximately 30 genetic tests to Laboratory-1 each month. Towards the end of the meeting, HARRIS entered the conversation, and BARRY KURTZER stated that he planned to pay HARRIS and KENNEDY $500 to collect additional DNA swabs from patients. BARRY KURTZER said to HARRIS, "I'll make another deal we will bump it up to 500 [dollars], and then make sure to get [Individual-1] all the swabs that [Individual-1] needs[.]" HARRIS responded, "Okay."

10. On or about October 4, 2019, HARRIS and Individual-1 exchanged text messages that referenced the kickback scheme. In those texts, HARRIS wrote that,

---

[3] For all quoted text messages in this Complaint, grammatical and typographical errors are from the original. Bracketed text has occasionally been added for clarity.

with few exceptions, "we've swabbed everybody due on the schedule each day[.]" She asked Individual-1 "what our number for swabs was this month since September 12th" and when Individual-1 planned to "take[ ] care of" the arrangement they discussed during Individual-1's previous visit. Individual-1 responded by text that their volume of genetic tests was "increasing" and that Individual-1 was coming to the Kurtzer Offices in mid-October to pay BARRY KURTZER "2k from [the] past and 3k for sept[ember]."

11. On or about October 17, 2019, during a recorded meeting inside a locked room in the Scranton Office, BARRY KURTZER accepted from Individual-1 kickbacks and bribes totaling approximately $5,000 cash. BARRY KURTZER counted the money and said, "Perfect. Didn't short me." During the same conversation, they discussed the volume of genetic tests sent from the Kurtzer Offices to Laboratory-1, and Individual-1 told BARRY KURTZER that HARRIS and KENNEDY were "on point" and doing a "good" job. BARRY KURTZER responded, "They're probably after the money already this month."

12. In group text messages sent on or about October 17 and 25, 2019, KENNEDY and HARRIS complained to Individual-1 that BARRY KURTZER gave them only $100 each from the money that Individual-1 paid him on or about October 17, 2019. KENNEDY wrote that BARRY KURTZER had previously agreed to pay them "500 [dollars]" for them to "split." HARRIS wrote that she and KENNEDY did their part by "push[ing] the swabs" on virtually every "Medicare patient" that came in "since we made that agreement."

13. On or about November 21, 2019, during a recorded meeting inside a locked room in the Greentown Office, BARRY KURTZER and ROBIN KURTZER accepted from Individual-1 approximately $3,000 cash in exchange for genetic tests that BARRY KURTZER and his staff, including HARRIS and KENNEDY, sent to Laboratory-1.[4] After receiving the cash, BARRY KURTZER joked about the exacting manner in which ROBIN KURTZER was counting it. Later that day, in a separate recorded conversation with HARRIS and KENNEDY, Individual-1 told them about the approximately $3,000 payment that BARRY KURTZER has just accepted from Individual-1.

---

[4] During the same recorded meeting, BARRY KURTZER also took from Individual-1 an additional $800 cash kickback and bribe for clinical allergy tests that BARRY KURTZER and his staff, including HARRIS and KENNEDY, submitted to Laboratory-1. The same day, ROBIN KURTZER, HARRIS, and Individual-1 discussed in a recorded conversation that the allergy testing was "was too much of a headache" and was going to stop.

6

14.     On or about November 22, 2019, during a recorded phone call between ROBIN KURTZER, BARRY KURTZER, and Individual-1, ROBIN KURTZER chastised Individual-1 for telling HARRIS and KENNEDY about the amount of "money that you're giving us[.]" ROBIN KURTZER complained that "[w]e should not have to bribe them to do work, in all honesty." But, ROBIN KURTZER said that she ultimately had no "trouble giving them money" as long as they produced results.

15.     In or about December 2019, KENNEDY sent a series of group texts to HARRIS and Individual-1 in which she asked Individual-1 about their "payment agreement" and touted their "heavy volume" of genetic tests for that month. On or about December 17, 2019, in the same group text chain, KENNEDY wrote to Individual-1 that she spoke to BARRY KURTZER and ROBIN KURTZER, and BARRY KURTZER "wanted to let you know that between Scranton and [Greentown] we sent in close to 25 swabs for this month." KENNEDY also asked over text if Individual-1 was "coming this month" to see them because she and HARRIS were "relying on that money for holidays." Individual-1 replied by text, "Tell doc [referring to BARRY KURTZER] I don't have any $ to pay because of lack of volume in November. If he doesn't send Pgx samples in, I don't get paid. If it don't get paid, I can't pay you guys." In text message responses, HARRIS and KENNEDY each expressed frustration that Individual-1 was not paying them that month.

16.     Individual-1 next visited the Greentown Office on or about January 14, 2020. During a recorded meeting inside a locked room, BARRY KURTZER accepted from Individual-1 a kickback and bribe of approximately $3,500 cash, explaining that $3,000 was part of their "normal deal" in exchange for "29 good samples" that BARRY KURTZER and his staff had submitted to Laboratory-1 in December. The other $500, according to Individual-1, was to appease ROBIN KURTZER. BARRY KURTZER counted the money out loud and confirmed, "We're perfect." Individual-1 also told BARRY KURTZER that Individual-1 brought approximately $500 for HARRIS and KENNEDY, to which BARRY KURTZER responded, "Okay so then you give it to them." Accordingly, Individual-1 then met with HARRIS in the Greentown Office and HARRIS accepted the approximately $500 kickback and bribe from Individual-1 to split with KENNEDY, who was out that day. During their recorded exchange, Individual-1 told HARRIS, "I gave him his money [referring to BARRY KURTZER] and here's 500 dollars for you guys." HARRIS responded, "You're a life saver." Approximately two days later, on or about January 16, 2020, KENNEDY texted Individual-1, "thank you for the money[.]"

17.     On or about February 12, 2020, KENNEDY sent group text messages to HARRIS and Individual-1, telling Individual-1 that they hit their genetic testing quota for the month. She wrote, "We did our 17. Scranton is supposed to carry the rest per doc [referring to BARRY KURTZER]." During the same exchange,

7

KENNEDY asked Individual-1 if Individual-1 planned to pay them in person or using a mobile phone app that allowed users to transfer money to one another with their cell phones (the "App"). Individual-1 wrote back, "I prefer in person. No trace!" KENNEDY responded by text, "yea I figured you'd com[e] in person haha[.]"

18. On or about February 20, 2020, during a recorded meeting in the Greentown Office, BARRY KURTZER accepted his monthly cash kickback and bribe of approximately $3,000 from Individual-1 for steering PGx genetic tests to Laboratory-1 in New Jersey. At BARRY KURTZER's direction, Individual-1 separately paid an approximately $500 cash kickback and bribe to HARRIS for her to split with KENNEDY. During the same visit, BARRY KURTZER, HARRIS, and KENNEDY agreed to start transitioning from sending genetic tests from Laboratory-1 to sending them to Laboratory-2, which, according to Individual-1, collected a higher Medicare reimbursement per genetic test, including up to approximately $6,000 for each CGx.

19. On or about March 3, 2020, KENNEDY texted Individual-1, "what is our number for the month of February." Individual-1 texted back, "40 Pgx to [Laboratory-1] in February. 36 are good[,]" meaning that 36 of those genetic tests were successfully billed to Medicare. KENNEDY then asked by text if she was going get "an increase" in her kickback payments, citing "a lot of paper work and extra swabs for cancer [genetic tests]" that she started doing for Laboratory-2. Individual-1 wrote back, "[W]e'll dicuss for sure. You know I'm good for it," and KENNEDY replied, "Okay and yes we know lol."

20. On or about Mach 13, 2020, Individual-1 texted BARRY KURTZER that Individual-1 had safety concerns related to the growing COVID-19 pandemic and suggested making the next payment by "wire." BARRY KURTZER responded by text, "Great[.]" Then, on or about March 17, 2020, Individual-1 wired a kickback and bribe payment of approximately $3,000 from New Jersey to BARRY KURTZER's bank account. Individual-1 followed up by texting BARRY KURTZER, "I just wired you the money liked we discussed," and asking, "pls confirm receipt once it clears on yourend.. this is for feb samples." Individual-1 also texted BARRY KURTZER, "I'll pay the girls [referring to HARRIS and KENNEDY] separately via [the App] thing they were bugging me about." BARRY KURTZER texted back, "Wow thanks."

21. On or about that same day, Individual-1 paid HARRIS and KENNEDY each an approximately $400 kickback and bribe using the App, and they both confirmed receipt of those payments. In a group text message related to those payments, KENNEDY wrote to HARRIS and Individual-1, "[Y]ou don't have to say

8

what it's for you can say anomouse," meaning that the App allowed them to conceal the true purpose of the transaction.

22. In or about April 2020, Individual-1 used the App to pay kickbacks and bribes to BARRY KURTZER, HARRIS, and KENNEDY for genetic tests sent to Laboratory-1 and Laboratory-2. Specifically, on or about April 28, 2019, Individual-1 paid HARRIS and KENNEDY approximately $300 each using the App. And, over the next several days, Individual-1 sent BARRY KURTZER two payments of approximately $2,000, each time through ROBIN KURTZER's App account.

23. Even as the COVID-19 pandemic continued, BARRY KURTZER and his coconspirators continued their scheme. For example, on or about April 28, 2020, KENNEDY sent a group text to HARRIS and Individual-1 saying, "Can possibly get 6 swabs today."

24. In total, over the course of the charged conspiracy, Medicare was billed approximately $1,241,110 for genetic tests that BARRY KURTZER and his staff steered to Laboratory-1, and approximately $71,856 for genetic tests that they steered to Laboratory-2.